THE BETHLEHEM IRON COMPANY et al.

v.

PHILADELPHIA AND SEA SHORE RAILWAY COMPANY.

1. Where an officer, who conducts a public sale, pursuant to an order of the chancellor, in the intelligent and *bona fide* exercise of his discretion, refuses an adjournment, his action will not constitute a reason why the sale shall not be confirmed.

2. Mere inadequacy in the price bid at a fairly and regularly conducted sale of the character above indicated, will not justify refusal to confirm the sale.

3. A bidder, at such a sale, will not be deprived of the advantage of his bid because other persons offer to bid, upon a resale, twenty-one per cent. more for the property.

Upon objections to confirmation of receiver's sale.

*Mr. Howard Carrow*, for the receiver.

*Mr. Samuel W. Beldon* and *Mr. Samuel Dickson*, for the objectors.

*Mr. Lindley M. Garrison, pro se.*

THE CHANCELLOR.

By an order, dated on the 13th of December, 1891, the receiver of the Philadelphia and Sea Shore Railway Company was directed to make sale of the railroad in his charge, together with its equipment, free from all encumbrances thereon. In obedience to that order, the receiver duly advertised the property for sale, at public vendue, at the sheriff's office, in the court house, in the

city of Camden, on Tuesday, the 23d day of February, 1892, and at the time and place so advertised, at a public auction, largely attended and fairly conducted, struck off the property to Lindley M. Garrison for $185,000, he being the highest bidder therefor, and, according to the terms of sale, then received from him $37,000, twenty per cent. of the purchase price.

The conditions of sale provide that the sale is made subject to the chancellor's approval.

The receiver has reported that the sum bid by Mr. Garrison is the highest and best price that could be obtained in cash for the property sold, at the time of the sale.

By petition, and exceptions to the receiver's report, Emlen Physic, Morris Boney, James F. Conway and George H. Becker oppose a confirmation of the sale. They allege that the railroad cost more than $400,000, and they show that the fair value of its construction was nearly that sum; that James Taylor and Logan M. Bullitt, two gentlemen who are interested in lands which the railroad may be used to render marketable, early in January of this year, undertook to form a syndicate to purchase the road at the receiver's sale; that Messrs. Taylor and Bullitt agreed with each other that Mr. Taylor was to obtain subscriptions to their enterprise to the extent of two-thirds of $250,000, and that Mr. Bullitt was to obtain subscriptions for the remaining third of that sum; that, at the time of the sale, Mr. Taylor had secured promises that nearly all the money he was required to raise would be forthcoming, but that Mr. Bullitt had not then secured the amount that he was to procure, but had merely succeeded in awakening an interest in some persons, who were making inquiries about the property; that because of distracting illness in his family, which consumed his time, Mr. Bullitt had not been able to do more than excite such interest in the scheme proposed; that on the day preceding the sale Mr. Bullitt addressed a note to the counsel of the receiver, in which he stated that he had interested persons in a proposed purchase of the railroad, but that he had not been able, because of the illness in his family, to arrange details or impart all the information that those persons desired, and that he wished a postponement of the sale for two

weeks, adding that, in the event of such adjournment, he would "probably" be able to make a "substantial bid," and that the next day, at the sale, Mr. Taylor asked the receiver for an adjournment, explaining to him that he (Taylor) had secured subscriptions to about the amount he had agreed to raise, but they could not be utilized because they depended upon Mr. Bullitt's success. As to Mr. Bullitt, the situation, then explained to the receiver, it is best stated in Mr. Bullitt's own language. He says:

> "There were numerous things that had to be done. These people had expressed their willingness to put their money in, but before they had definitely agreed to do it, they wanted certain information and they wanted the details of the plan arranged, and those details and that information had to be such as would satisfy a number of people. Each one had a particular thing that they wanted to know about and wanted to arrange for, and that required a great deal of detail work and seeing a great many people and managing it satisfactory to them."

It appears that when the application to postpone the sale was made to the receiver, he, in order to preserve a live, and, therefore, more salable, plant, had been operating the railroad for several months at a considerable loss, to meet which he had issued receiver's certificates for a large amount, pledging therefor the anticipated proceeds of sale of assets which were special in character and without market value; that this operating loss was increasing at the rate of $20 each day; that the railroad was then almost without equipment and so badly in need of repair that its continued operation was attended with great danger of additional loss through liability for accidents; that the sale was largely attended by persons interested in it and apparently prepared to bid for the property, and that under these conditions, in the exercise of his discretion, he concluded that it would be unwise to postpone the sale, and, therefore, refused to grant Mr. Taylor's request.

The present objectors claim to be interested as holders of bonds secured by a mortgage upon the railway which will be cut out by the sale. They do not show that they participate in the syndicate contemplated by Messrs. Bullitt and Taylor, or that they endeavored in any manner to assist the receiver to secure a

good price for the railroad. They appear to have been silent at the sale. Now they come forward and urge that the price bid by Mr. Garrison for the railroad is inadequate; that Messrs. Bullitt and Taylor should have been allowed a longer time to form their syndicate, and that Mr. Garrison has purchased in interest of a competing railroad for the purpose of creating a monopoly which will be detrimental to the interests of the public, and they offer to bid $40,000 in excess of the price for which the property was struck off to Mr. Garrison, if a resale shall be ordered.

The proof attempted in support of the assertion that Mr. Garrison purchased in the interest of a competing railroad has failed, so that it is unnecessary for me to consider the validity of that objection.

The objections to the confirmation of the sale, to be considered, are two—*first*, that the receiver should have adjourned as Messrs. Bullitt and Taylor requested, and, *second*, that Mr. Garrison bid an inadequate price for the property, and that an advance of $40,000 over his bid is now offered.

The testimony of Mr. Bullitt exhibits that if the receiver had granted the adjournment sought, Mr. Bullitt would not have been prepared to bid at the sale. He says that, because of his domestic trouble, he was not able to attend to any business matters before the 8th of March, which was the very day to which the sale would have been adjourned if his request had been granted. Mr. Taylor's preparation depended upon Mr. Bullitt's, and thus it appears that the desired adjournment would not have afforded Messrs. Bullitt and Taylor sufficient time to mature their scheme. The proofs, it is true, indicate that the syndicate is now, a month from the sale, formed, and that the objectors propose to utilize it in making good their undertaking to bid in case of a resale, but its success at this time does not satisfy me that it would have been practicable to form it if Mr. Garrison had not given the railway property a value and inspired confidence in it by his bid. The action of the receiver in denying an adjournment must be considered in the light of the circumstances which surrounded him when the adjournment was asked for.

His indebtedness, the cost of continuing the operation of the road, his liability for accidents, the vagueness of his information as to the Bullitt and Taylor scheme and the uncertainty as to its fruition, and the large attendance at the sale, were the factors with which he dealt.   There is not the slightest intimation that in refusing the adjournment he acted in bad faith.   On the contrary, the case abounds in ample proof that he most anxiously strove to so manage the sale as to realize the highest and best price for the property.   His refusal of the adjournment was clearly an act of good faith, and, I think, an intelligent exercise of his discretion.   Such a refusal would not justify me in setting aside the sale if confirmed (*Skillman* v. *Holcomb, 1 Beas. 131;* *Vanduyne* v. *Vanduyne, 1 C. E. Gr. 93 ; Cline* v. *Prall, 12 C. E. Gr. 415*), and I do not perceive why it should induce me to withhold confirmation.   The purchaser has bid a large sum for the property, and has actually paid the receiver $37,000 upon faith that he has acquired rights which forbid me to arbitrarily refuse confirmation of the sale.   I think his position is a sound one.   It is right, notwithstanding the condition of sale which subjects the receiver's action to the chancellor's confirmation. That condition refers the matter to the chancellor's judicial action, not to his arbitrary will, and, unless there be some substantial reason for overthrowing the sale, resting upon misconduct of the receiver, or in fraud, accident or mistake prejudicial to the objectors, the sale must be confirmed.

In approaching the second objection, that the sale was for an inadequate price, in excess of which the objectors now offer $40,000, we are confronted by the decision of the court of errors and appeals in the case of *Morrisse* v. *Inglis, 1 Dick. Ch. Rep. 306.* In that case, I refused to confirm a sale in partition and ordered a resale, because, among other reasons, it appeared that the property had been sold for an inadequate price, and responsible persons offered security to bid, upon the resale, about $3,000 in excess of the former bid for the property.   My order was appealed from and reversed by the court of errors and appeals. Upon the objection to the sale above indicated, that court said that it had been the long settled practice of the courts not to set

aside sales for mere inadequacy of price, unless, perhaps, in cases where that inadequacy might be so gross as to shock the conscience and become evidence of fraud; that, estimating the value of the land by the subsequent offer in that case of an advance of ten and a quarter per cent. over the bid at the sale, it did not appear that the bid at the sale was a grossly inadequate price for the property, and that the uniform current of authority in this state was against the adoption of the practice of the English court of chancery, which permits the opening of a sale when an offer to pay a greater amount for the property is made. Mr. Justice Magie, who wrote the opinion of the court, justifies the position taken by the courts of this state in the following language: "This well-known practice is in accord with the policy of our law respecting such sales, which are required to be made, after advertisements sufficient to give publicity, by outcry to the highest bidder. It is of the greatest importance to encourage bidding by giving to every bidder the benefit of bids made in good faith and without collusion or misconduct, and, at least, when the price offered is not unconscionably below the value of the property. Nothing would more evidently tend to discourage and prevent bidding than a judicial determination that such a bidder may be deprived of the advantage of his accepted bid whenever any person is willing to give a larger price. The interest of owners in particular cases must give way to the maintenance of a practice which, in general, is in the highest degree beneficial."

Unless the practice affirmed by this decision be changed by the act of 1890, to which I shall presently refer, it must unquestionably settle the objection now considered, for it cannot be said that the price bid by Mr. Garrison, $185,000, is so much below the value offered by the objectors, $225,000, as to shock the conscience. The objectors offer an advance of twenty-one per cent. If their offer be taken as the value of the property, it exhibits that Mr. Garrison's bid was more than four-fifths of that value. Such a bid, at a fair public sale, does not shock the conscience.

At the session of the legislature which immediately followed the decision of *Morrisse* v. *Inglis* by the court of errors and

appeals, a further supplement to the act entitled "An act respecting the court of chancery" was passed (*P. L. of 1890 p. 138*), by which it was enacted that the provisions of the law respecting the confirmation of mortgage foreclosure sales (*P. L. of 1880 p. 255, Rev. Sup. 490 § 4*) should apply to and govern all sales of land or any interest therein made under and in virtue of any decree or order of the court of chancery, subject to such rules and orders in respect thereto as the said court should at any time make. The law thus applied provides that a report of the sale shall be made, and that the sale shall be confirmed if the court shall approve it, and that no sale shall be confirmed by the court until the court shall be satisfied by evidence that the property has been sold "at the highest and best price the same would then bring in cash."

It is suggested that the effect of this legislation is to overthrow the practice reaffirmed in *Morrisse* v. *Inglis,* and to virtually introduce the English practice, which the holding in that case condemns. It is observed, however, that the statute of 1890 merely extends the scope of the provisions of an existing law. The two laws are *in pari materia,* and are to be regarded as constituting one system.

The act of 1880 was judicially construed in 1881 in the case of *Delaware, Lackawanna and Western R. R. Co.* v. *Scranton, 7 Stew. Eq. 429,* by Chancellor Runyon, as not introducing the English chancery practice, but as merely giving parties in interest an opportunity to show that the property had not been sold for the highest price it would bring at the sale in cash. His language is: "It is urged, however, that the act of 1880, above referred to, has introduced a practice as to sale under foreclosure akin to the English practice of opening biddings, because it makes it necessary to the validity of such sale that they be confirmed. But that act, while it indeed makes confirmation necessary, imposes no condition, except that it must appear, by proof, that the property has been sold at the highest and best price it would bring at the time of the sale in cash—that is, that it has brought the best price that could be got for it at the time, at sheriff's sale, for cash. The design of the legislature in requir-

Bethl hem Iron Co. *v.* Philadelphia and Sea Shore Ry. Co.

ing judicial action on every such sale was not that, through the setting aside of sales, mortgaged property might be saved from effectual sale until an adequate price for it should have been obtained, but that those interested in having the property well sold might have opportunity to object to the sale; and if it should appear that the property had not brought the highest price it would bring at sheriff's sale in cash, the sale might be set aside."

It was after this interpretation had been put upon the act of 1880, and in view of it, that the act of 1890 became a law, and it must be assumed, in absence of any legislative dissent from that interpretation, that the lawmakers intended the act of 1890 to have the same meaning that had for nine years been ascribed to the law which it extended.

It appears to me to be clear that the practice affirmed in *Morrisse* v. *Inglis* was not abrogated by the act of 1890, but that it remains in force to control the disposition of the objection now before me.

It is very clear that Mr. Garrison's bid represents the highest price that the property in question would bring at the receiver's sale upon the day on which it was sold, and I am constrained to believe that, but for its influence in inspiring confidence and courage, the objectors would not be in position to make their present offer. It is plain, under the circumstances, that, however much I may desire to secure the additional $40,000 for distribution among the creditors of the insolvent company, I cannot refuse to confirm the sale.